N6R5youS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

              v.                             18 Cr. 262 (VEC)

FABIO SIMON YOUNES ARBOLEDA,

              Defendant.

------------------------------x

                                             June 27, 2023
                                             2:40 p.m.


Before:

                   HON. VALERIE E. CAPRONI,

                                        U.S. District Judge



                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KAYLAN E. LASKY
     KYLE A. WIRSHBA
     Assistant United States Attorneys


LAW OFFICES OF DANIEL A. McGUINNESS, PC
     Attorneys for Defendant
BY:  DANIEL A. McGUINNESS


ALSO PRESENT:  CRISTINA WEISZ, Spanish Interpreter
               ERIKA DE LOS RÍOS, Spanish Interpreter


                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

N6R5youS1

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearance for the record.

MS. LASKY:  Good afternoon, your Honor.  Kaylan Lasky for the government.

THE COURT:  Good afternoon, Ms. Lasky.

MR. McGUINNESS:  Good afternoon, your Honor.  Daniel McGuinness for Fabio Simon Younes Arboleda.

THE COURT:  Good afternoon, Mr. McGuinness.

Good afternoon, Mr. Younes.

THE DEFENDANT:  Good afternoon.

THE COURT:  OK.  Please be seated, everybody.

The sentence was adjourned several times because Mr. Younes had something that he wanted to raise with the Court.  Has that been resolved, Mr. McGuinness?

MR. McGUINNESS:  No, your Honor, and I wish to address that, if that's OK.

THE COURT:  OK.

MR. McGUINNESS:  Your Honor, I have filed a letter under seal dealing with Mr. Younes, his health issues.

THE COURT:  I have read that.

MR. McGUINNESS:  Your Honor, I believe it is an urgent matter to have him sentenced and designated to a medical facility.  He has a different opinion, he would like more time to work on his letter to the Court.  I have given this no small

N6R5youS1

amount of thought having spent several hours discussing it with my client with the benefit of an interpreter.  I don't believe his rights would be prejudiced by moving forward with sentencing and I believe his health is gravely at issue and is in danger at the MDC and he needs to get to a medical facility, and the only way to make that happen is for the sentencing to go forward swiftly.

THE COURT:  So, is he going to tell me about this issue when it is his turn to talk?

MR. McGUINNESS:  Mr. Younes is aware and has been aware that he will be afforded an opportunity to address the Court directly.

THE COURT:  All right.  That's fine.

So, Mr. McGuinness, have you and your client read the presentence report dated August 2, 2022?

MR. McGUINNESS:  Yes, your Honor.  He has gone through it in detail with prior counsel.

THE COURT:  Have you discussed it with him as well?

MR. McGUINNESS:  Yes.

THE COURT:  Mr. Younes, did you read the presentence report?

THE DEFENDANT:  Your Honor, I don't remember very well.  This is dated August last year but I believe I read it.  Some things are not included.  Those things are things that were negotiated with the government and have not been included.

N6R5youS1

THE COURT:  OK.  Well, Mr. Younes, you are going to have an opportunity to tell me whatever it is you want, what you think I should know before I impose sentence.  OK?

THE DEFENDANT:  Your Honor, humbly and respectfully, I would like to request from your Honor a short period of time to submit the motion that you kindly requested.  If you read that letter, you will see that there will be 180 degrees change in my case.

THE COURT:  Mr. Younes, the request for more time is denied.  We are proceeding to sentence today.  The sentencing has been set for well over a month, you knew this day was coming.  We are going to proceed.

THE DEFENDANT:  Your Honor, that's true.  But for reasons that I hope you will receive as my explanation, of conditions of jail, of being indoors constantly, I have no time to go out and use the computer or view the disks or use the phones and that's not my fault.  I humbly, respectfully, request if you can grant me one month, I wish to -- the letter that I had already prepared to submit to you, I have no idea where it is.  I don't know if it is in Westchester or if it reached --

THE COURT:  Mr. Younes, we are not doing this.  I'm sorry.  I have told you the last time I saw you you are proceeding to sentence.

THE DEFENDANT:  (In English)  OK.

N6R5youS1

THE COURT:  We are proceeding to sentence.  The only question on the table right now is whether you discussed the presentence report with your prior attorney.  I am confident you did because I received comments that quite obviously came from you.  So, can you confirm that you discussed the presentence report with Mr. Yannella?

THE DEFENDANT:  If you are referring to Santiago, the lawyer?

THE COURT:  No.

THE DEFENDANT:  We didn't discuss much.

THE COURT:  No.  I am referring to Donald Yannella. Mr. Yannella, your first attorney.

THE DEFENDANT:  Yes, I did speak to him.

THE COURT:  Perfect.  OK.

Mr. McGuinness, Mr. Yannella's sentencing submission contested a number of different items that are in the presentence report.  I don't believe any of them are particularly material to sentencing but is the defendant requesting a Fatico hearing?

MR. McGUINNESS:  No, your Honor.  I think it has been addressed with the revisions in the parentheticals, so while Mr. Younes stands on his objections, I believe they've been incorporated into the PSR sufficiently.

THE COURT:  Fine.  Are there any other objections to the report that have not already been noted?

N6R5youS1

MR. McGUINNESS:  Your Honor, just minor corrections as to his health that I addressed in the submission.  I am happy to go through them now.

THE COURT:  Do you want changes to be made to the presentence report?

MR. McGUINNESS:  Yes, please.

THE COURT:  What would you like then.

MR. McGUINNESS:  Specifically, I believe it is paragraph 76.

THE COURT:  Yes.

MR. McGUINNESS:  The defendant reported that currently the obstruction measures 2.5 millimeters.  I would ask that that be changed to the obstruction was measured at 4 centimeters as of May 2023.

THE COURT:  Was measured at how many centimeters?

MR. McGUINNESS:  4 centimeters.

THE COURT:  4 centimeters, not millimeters.

MR. McGUINNESS:  Yes.  Millimeters was, I believe, a typo.

THE COURT:  4 centimeters on what date?

MR. McGUINNESS:  May 2, 2023.

THE COURT:  We will make that change.

MR. McGUINNESS:  I believe millimeters should be changed to centimeters in the following sentence as well.

THE COURT:  Yes.  OK.  Those changes will be made.

N6R5youS1

The presentence report -- anything else, Mr. McGuinness?

MR. McGUINNESS:  Your Honor, there is the same issue in the justification section on page 24.

THE COURT:  That is not part of the presentence report, that is just the recommendation.

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  OK.  The presentence report will be made part of the record in this matter and placed under seal.  If an appeal is taken, counsel on appeal may have access to the sealed report without further application to this Court.

I received a sentencing submission from the defense drafted by Mr. Yannella which was dated December 1, 2022 that included a letter from Mr. Younes' daughters, some medical records, and a confirmation that he had no disciplinary shots at Westchester County jail.  I received a letter from Mr. McGuinness dated June 20, 2023 that updated the situation relative to Mr. Younes' medical condition and, in particular, he has an abdominal aneurysm.  That letter was filed under seal.  I really don't see any reason for it to be under seal, we are going to discuss all of that as part of the sentencing submission, so I'm going to direct you to refile it on the public docket.  If you want to redact the medical records that are attached that's OK, but the letter itself, it should be on the public docket.

N6R5youS1

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  I received a letter from the government dated December 1, 2022.

The defendant pled guilty to one count of conspiracy to import cocaine into the United States.  The presentence report reflects a guideline level of 35, Criminal History Category I.  I find the correct guideline calculation is as follows:  We turn to the drug guidelines because the offense involved more than 450 kilograms of cocaine.  Pursuant to 2D1.1(a)(5) and (c)(1) that's a base level of 38.  The defendant pled guilty and accepted responsibility so that's minus 3, bringing us to an adjusted offense level of 35.  The defendant has no known criminal history so he has no criminal history points, putting him in Criminal History Category I.  Level 35, Criminal History Category I, yields a guideline range of 168 to 210 months.

Are there any guideline arguments I have not addressed?  Ms. Lasky?

MS. LASKY:  No, your Honor.

THE COURT:  Mr. McGuinness?

MR. McGUINNESS:  No, your Honor.

THE COURT:  I don't see a basis for a departure from the guidelines.  Are there any factual issues in dispute?

MS. LASKY:  No, your Honor.

MR. McGUINNESS:  Not aside from the ones raised with

the PSR, objected to.

THE COURT:  Would the government like to be heard on sentence?

MS. LASKY:  Your Honor, the government would rest on its submission, unless there are any questions that the Court has, which I am of course happy to address.

THE COURT:  The only question I have is how would the government assess the relative culpability between Gomez and Younes.

MS. LASKY:  Yes, your Honor.

The government views them as being relatively similar; they are both brokers.  Of course, the co-defendant was the one who actually went and got the five kilogram sample but they were both present at meetings and we view them as being generally similar.

THE COURT:  Thank you.

Mr. McGuinness, I have just a couple of questions before I turn things over to you.  The presentence report says that the defendant is a lawful permanent resident, that's on page 2, although during his allocution he told me that he had no status in the United States.  It also shows that he has two A numbers and the presentence report said he has no Social Security number.  So, is it a mistake on the cover page that he is an LPR?

(Defendant and counsel conferring)

N6R5youS1

MR. McGUINNESS:  My client informs me that he did become a green card holder in 1994, your Honor.

THE COURT:  Did he return to the United States frequently enough that the green card is still in effect?

THE DEFENDANT:  Up to now I think it is.

THE COURT:  Did you come back to the United States -- your family is all shaking their head vigorously.

UNIDENTIFIED SPEAKER:  He hasn't come back since 1988 -- 1991.

THE COURT:  OK.  Here is what I am going to do.  Thank you for that information.  I am going to direct the government to ascertain from Immigration whether he still has a green card.  It sounds like it probably lapsed because you didn't return to the country; and second, which of the A numbers that are listed on the cover sheet are correct or if both of them are correct and just let chambers know.  We will correct the presentence report or have probation correct the presentence report to clean up those items so that the Bureau of Prisons knows what they've got.

MS. LASKY:  Yes, your Honor.

THE COURT:  OK.  That was my only question, Mr. McGuinness, so go ahead.

MR. McGUINNESS:  Yes, your Honor.

As detailed in the presentence submissions, Mr. Younes Arboleda's time incarcerated has been far harsher than even

N6R5youS1

this Court is used to seeing, and this Court is very familiar with the horrific conditions that are going on in the pretrial holding facilities right now.  Even before he reached Westchester County Jail he spent an enormous amount of time -- 19 months -- in holding facilities in Colombia in Picota prison with horrible conditions.  Horrible conditions.  At 72, 73 years old, having to walk up and down nine flights of stairs for visits, visits that were cut off and didn't happen for a year and a half, it was even longer than that he went without any visit from his family.  The conditions, I don't have to recite all of them, I know your Honor knows them; the severe lockdowns, the lack of programs, the eating cold food through the slot for days on end.  This is not humane conditions, this is the reality we live in though, sadly.  And this hardship he has experienced, being without his family, being in these harsh conditions, is a continuation of the hardship he has had to overcome his entire life.

He grew up in a very poor family in Bogota in a large family as the oldest son, and when he his father passed away he assumed that responsibility, he assumed the responsibility of providing, of finding employment and providing sustenance for his family and then his own family, his own four children who have come here today, two daughters are here, grandchild, his wife are all here to support him today.

His lack of time not seeing his family has hit him

extraordinarily hard; it hit him hard in Colombia when they weren't able to visit during the heart of the pandemic as he suffered along, first fearing for his life because FARC and paramilitary both didn't know what to do with him, he was an in-between person.  And the government doesn't claim he belonged to FARC.  It is very important that is stated and he wasn't a paramilitary person.  So these two deadly gangs had him caught in the middle and he feared for his life, and then COVID comes and he is watching people die all around him in a horrible facility down in Colombia before he even gets to the United States and has to experience the conditions here.  And through all of that, the most difficult part was being away from his family.  That is his roots, that is what gives him his reason for being, his connection to his family, and he spent years not being able to see them at all and even now his closest relative is down in Miami and very infrequently can visit.

He was 72 years old when he was arrested.  Since that time he has been a model prisoner.  As the Court noted, that was submitted.  Also on that submission it noted that no educational programs were available for him.  He is 72 years old, it is not -- Mr. Younes doesn't need to pick up a trade but, your Honor, the core of most of those programs that come before the Court is self-reflection, self-growth, whether it is a leadership course, an anger management course.  We would hope

that someone has the opportunity to participate in a program that allows them to reflect on what put them there, that they would have some other resource besides the four walls surrounding them to think about what they're going to say to the Court at sentencing.  He has not had that benefit.  He has not had opportunity to take a single program.  I ask that the Court consider that when fashioning his sentence.

He has been housed recently, since I have been on the case at the MDC.  The MDC's most recent crisis is staff shortages, I am sure the Court is well aware --

THE COURT:  Yes.

MR. McGUINNESS:   -- and he spent days long in lock-ins.  I have spoken to his family, they said that they have seen a marked decline in him over this period, and I think that is completely understandable and what you would expect from someone who is an advanced age, without any programming, stuck in a small box of a room, day in and day out, your Honor. I ask that the Court keep all of that in mind throughout this proceeding.

His submission noted that the average life expectancy is in Colombia is 77 years old.  He is now that age.  He is living with a deadly, deadly condition.  He is very much on borrowed time, your Honor, and he acknowledges that and he wants nothing more than to get back to his family and enjoy whatever remaining time he has atoning for what he did.

N6R5youS1

For all of those reasons, your Honor, I do believe that a sentence substantially below the guidelines, in line with a minimum sentence of five years or thereabouts, would be sufficient to achieve the ends of justice in this matter.

Thank you.

THE COURT:  Thank you, Mr. McGuinness.

Mr. Younes, would you like to be heard?

THE DEFENDANT:  Yes, your Honor.

What I would like to find out, if you will receive well what I have to say to you.

THE COURT:  Well, I don't know what you are going to say.  I am here to listen.

THE DEFENDANT:  I beg, your Honor --

THE COURT:  Remember that the translator has to translate.

THE DEFENDANT:  (In English)  OK.  Yes.

THE DEFENDANT:  I beg you that before sentencing you will give me the chance to submit the letter --

THE COURT:  Just tell me what the letter is going to say.

THE DEFENDANT:  In my letter I would like to detail two very important facts.  I worked with the U.S. government from 2014 to 2017 through the political branch of the embassy and I have the evidence of that.  I report the attorney general -- I denounce, I reported the behavior of the attorney

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

general of my country for political narco trafficking.  And I also would say that I have evidence that he would retaliate by bribing DEA agents and I have evidence of that, and when I say evidence or proof I am talking about real evidence and not imaginary ones.  That right now the FBI and the general inspector and international journalism, among them AP, are aware of this and due to my reporting this I suffered three assassination attempts via -- and there are evidences and there are proofs of that.  Two have been in Colombia and one here. When I pled guilty, I was threatened with my life.  And the government has considered that all my fault was for introducing Mr. Marin in June, on June 20, 2019 to the DEA.  The CC 1, that was how he was named at that time.

THE COURT:  Do you mean 2019?

THE DEFENDANT:  2017.  And due to that introduction, and Marin as a member of the FARC tools or evidence was fabricated against me and I would like to stress out to you, your Honor, that I am not going to be caught in a single lie so that the rest of the evidence in my favor cannot be rejected. I am a serious man, I respect your Honor very much, and this is not a game on my part to avoid responsibility.  The introduction turned out to be false because Marin Gomez and the C1 knew each other from three months prior so it wasn't a valid point that the fact that I introduced them in June 20.  The indictment reads from the beginning that Mr. Armando Gomez,

that he called, in spring of '17 he called CC 1 three months prior to June 20 to let him know that he had finally met somebody very close to the FARC and that, in addition, he was a nephew of Ivan Marquez.

THE COURT:  I'm sorry, who is he?  Marin?

THE DEFENDANT:  No.  Marin is a co-defendant of mine.

THE COURT:  Right.  So who are you saying did all of this stuff that you were just describing?

THE DEFENDANT:  I don't understand the question well.

THE COURT:  You were just telling me about someone who, back in the spring of 2017 --

THE DEFENDANT:  Armando Gomez, the co-defendant, he calls a Mexican guy to come to Colombia because he said he finally met somebody with direct contact with the FARC, Marlon Marin, who is also Ivan Marquez' nephew.

THE COURT:  OK.

THE DEFENDANT:  The government based the case on the fact that I was the one who introduced Marin when, in reality, they knew each other already.

THE COURT:  OK.  So what?

THE DEFENDANT:  And there are other points that I want to stress out but I don't want to take advantage of your time.

THE COURT:  Mr. Younes, I want you to tell me what you want to tell me.  Let me just remind you, though, that you admitted, under oath, that you agreed with others to import --

THE DEFENDANT:  That's what I want to show, that that is not true, that that's something that has been fabricated --

THE COURT:  Mr. Younes.

THE DEFENDANT:  -- and that I have the evidence.

THE COURT:  Mr. Younes, do you wish to take back your guilty plea and go to trial?

THE DEFENDANT:  No, your Honor.  I promised you that I was not going to withdraw my plea.

THE COURT:  I remember.

THE DEFENDANT:  But I do want you to be aware of all this prior to sentencing me.

THE COURT:  But, Mr. Younes, all of this is sort of irrelevant.  Who met who first, who said what to who first. That's not the point.  The point is you sat in meetings with someone that you were told is connected to the Sinaloa Cartel and you agreed to work as a broker to import into the United States hundreds of kilograms of cocaine.  That's the issue.  So who met who first is not the point.

THE DEFENDANT:  Yes, it matters, your Honor because I did not participate in the meetings the government says I was part of.  And that they say, the government fabricated what they call the movie in which they say that I'm a broker between the FARC and the Sinaloa Cartel, then they change my role to FARC's coordinator, then finally they say that I'm the political and financial backer of the Lebanon Hezbollah party

N6R5youS1

and the FARC in Colombia after I cut all my relationship with the CC 1, because when they invited me to wash 87 million U.S. dollars I cut the relationships with him. That took place November 1st, 2019.

THE COURT: Not 2019. You were in jail of in 2019.

UNIDENTIFIED SPEAKER: He said 2017.

THE DEFENDANT: 2017.

THE COURT: OK. So let me understand, Mr. Younes --

THE DEFENDANT: Before I was arrested.

THE COURT: Mr. Younes, you were tight enough with the FARC that they were asking you to launder $87 million? But you said no.

THE DEFENDANT: No. It was not the FARC, it was the Mexican guys, they were the informants who were pretending to be members of the Sinaloa Cartel, and when they made a proposal to me I kept my relationship with them and I say to them that I'm going to denounce them. And all of that is included in the government's evidence and I take part of the government's evidence to take part of my own defense and show that that's not true. I have never participated or been a member of the FARC. I have always fought against the FARC.

THE COURT: OK. Anything further you want to tell me?

THE DEFENDANT: No, your Honor. Thank you so much for listening to me.

THE COURT: One thing you said, Mr. Younes, and I was

N6R5youS1

not quite clear whether you were saying after you pled guilty you were threatened or before you pled guilty someone threatened you.  Which was it?

THE DEFENDANT:  Positively before pleading guilty I was threatened when I was in the bunker of the prosecutor and I was told if I would talk about or give out the names.

After I denounced him and I was free, I wasn't arrested, I was told, face to face, if you denounce us or you give our name, we will kill you.  Mr. Craig Michellin, special DEA Agent and the coordinator of operations against the FARC, he visited me three times in jail in Colombia trying to give him information about the political branch of the embassy.

THE COURT:  He was trying to give you information or trying to get information?

THE DEFENDANT:  Yes.

THE COURT:  Yes what.

THE DEFENDANT:  To give them information.

THE COURT:  The DEA was asking you to give him information?

THE DEFENDANT:  Yes; of the cases that we were investigating against prosecutors.

THE COURT:  OK.

THE DEFENDANT:  And also DEA agents.

THE COURT:  OK.  Were you threatened with harm if you did not plead guilty?

N6R5youS1

THE DEFENDANT:  Yes.

THE COURT:  Who threatened you that you would be hurt if you did not plead guilty?

THE DEFENDANT:  Several people did.

THE COURT:  Who?

THE DEFENDANT:  And I have letters.

THE COURT:  Who?

THE DEFENDANT:  They threatened me indirectly because they wouldn't do it directly.

THE COURT:  When?  When?

THE DEFENDANT:  (In English)  I were threatened with my life in 2019.

THE COURT:  No.  Were you threatened immediately around the time you decided to plead guilty in this case when you were in custody in the United States?

THE DEFENDANT:  Yes.

THE COURT:  By whom?

THE DEFENDANT:  Marlon Marin sent me a few notes. Other inmates advised me to plead guilty, not to go to trial.

THE COURT:  OK.  Mr. Younes, advice to plead guilty and not go to trial is not a threat.

THE DEFENDANT:  The threat was implied in suggesting that I should plead guilty, not to go to trial.

THE COURT:  OK.

THE DEFENDANT:  So that the names of people -- so that

N6R5youS1

the names of agents implicated will not come to light.

THE COURT:  Did you tell Mr. Yannella that you had been threatened?

THE DEFENDANT:  I told that to Yannella.

THE COURT:  When you pled guilty I asked you whether anyone had threatened you and you said no.

THE DEFENDANT:  How would I say "yes" or reply "yes" to you and then show up dead the next day?

THE COURT:  Mr. Younes, I'm sorry.  I don't believe any of this.

The plea took place a long time ago, you were under oath, you had every opportunity to tell me you were being threatened.  You did not do so.  Now when it is finally time to sentence you, now you are telling me that you were threatened.  That is not credible.

THE DEFENDANT:  I did do it and I told your Honor and I did mention during the hearing of April 2023, that docket no. 138 of September 23, 2022 was not done voluntarily and with knowledge.

THE COURT:  What was not done voluntarily and with knowledge?

THE DEFENDANT:  It was not voluntary because I was threatened.

THE COURT:  Hang on just a second, please.

(Defendant and counsel conferring)

N6R5youS1

THE COURT:  OK.  Just for the record, the defense attorney and the defendant have been given about five minutes for a conversation.

Mr. Younes, during the course of your guilty plea I asked you -- and this is on page 16 of the transcript: "Mr. Younes, has anyone threatened you or forced you to plead guilty?"  And you answered:  "No, your Honor."  That answer was under oath.  I asked your lawyer if there was any reason why I should not accept your guilty plea.  He said there was no reason why I should not accept your guilty plea.  So, all indications at the time you pled guilty was that you were pleading guilty of your own free will which you acknowledged.

Later I asked you, I said, Mr. Younes -- this is on page 19 of the transcript:  Mr. Younes, how do you now plead to Count One; guilty or not guilty?"

You said:  "Guilty."

I said:  "Are you pleading guilty voluntarily and of your own free will?"

And you said:  "Yes."

THE DEFENDANT:  My answers to your questions, your Honor, is that I am under death threats.  That's the critical point.

THE COURT:  I'm sorry you are under death threats.  I recommend that you provide the information to the government so that they can investigate it.  I have seen absolutely no

evidence that you are under a death threat.  What I see is a lot of evidence that you are doing everything in your power to postpone the date of reckoning.

And we are done.  Are we ready to proceed?

THE DEFENDANT:  OK, your Honor.

THE COURT:  Mr. McGuinness, after your conversation with your client, do you have any motion?

MR. McGUINNESS:  Madam interpreter?

(Defendant and counsel conferring)

MR. WIRSHBA:  I am due before Judge Torres at 4:00.

THE COURT:  Feel free to leave.

MR. WIRSHBA:  Thank you, Judge.

MR. McGUINNESS:  No, your Honor.  No motion at the time.

THE COURT:  Mr. Younes, federal law requires me to consider the nature and the circumstances of your offense and the history and characteristics of you.

You are a 77-year-old Colombian citizen who was at one point a legal permanent resident of the United States.  You are married and you have five children and multiple grandchildren. Two of your children reside in the United States.  You report that all of your children have graduated from college and have responsible jobs.  You, yourself, have some college and you had a business in Bogota before your arrest.  You have suffered from some sort of a blood clot in your aorta near the kidney

N6R5youS1

that was back in 2022 and you are currently being watched carefully by doctors because you have an abdominal aneurysm which is undoubtedly a serious medical condition.  You had and you recovered from COVID.

You spent about two years in prison in Colombia fighting extradition and arrived in the United States during the pandemic.  Taking all of that into account, federal law requires me to impose a sentence that is reasonable and no greater than necessary to accomplish the goals of sentencing.

I have considered all of the required sentencing factors as well as the guidelines.  In terms of what is most important we start with the fact that this is undoubtedly a very serious offense.

(Continued on next page)

N6R3YOU2

THE COURT:  (Continuing) Cocaine is a dangerous drug that destabilizes communities when it gets down to the retail level.  At the wholesale level, which is the level at which you were operating, cocaine destabilizes entire countries, including your own.

While there was no violence specifically associated with this particular deal or with Mr. Younes, as far as I know, Mr. Younes believed that he was dealing with members of the Sinaloa Cartel, and he represented himself and his colleagues as dealing with members of the FARC, and he purported to have connections to Hezbollah.  Although a peace process was underway, as a reasonably well-educated Colombian citizen, Mr. Younes knows and knew then how destabilizing the FARC was to Colombia, and just how dangerous major cocaine dealers are, including how dangerous the Sinaloa Cartel is.

So even if this happened to be his very first involvement with the trafficking of cocaine, which seems highly unlikely given the quantities involved, he knew he was dealing with a very dangerous product, and with dangerous people.

I've considered the need to promote respect for the law.  I see very little respect from this defendant.  He negotiated over a period of months to import massive quantities of cocaine into the United States with absolutely no regard for the laws of this country or the laws of his own country.

I've considered the need to provide just punishment

while avoiding unwarranted disparities.  Mr. Younes, this factor tells judges that they should treat similar people similarly, so there shouldn't be wild variances in sentences for the same offense.

The mandatory minimum sentences that are in place in this country can be shockingly high for low-level traffickers who are sucked into conspiracies that involve massive quantities of drugs.  But in this case, Mr. Younes, you were not a peripheral player.  You were personally involved in negotiating a huge shipment of cocaine.  Your co-conspirator delivered 5 kilograms of high-quality cocaine as a sample. This was no casual foray into the world of narcotrafficking.

Mr. Schifano, who was your money launderer, was sentenced to nine years.  Mr. Gomez, your co-conspirator who was involved personally with the sample of cocaine, received a sentence of 10 years.

While money launderers are a necessary component of narcotics trafficking, they are marginally less culpable than the actual narcotraffickers, which is where you sit, Mr. Younes.

I've considered the need to deter criminal conduct. There are two aspects of deterrence that Courts are supposed to consider:  General deterrence and specific deterrence.  General deterrence is how do we deter people generally.  That is to say, how do we get the word to Colombia, to people like you, to

N6R3YOU2

stay out of the world of narcotrafficking.  And specific deterrence is how do we deter you from again engaging in narcotrafficking.

In terms of general deterrence, I sincerely hope the word goes out in Colombia for whatever your sentence is that this is not to be trifled with.  Stay away from cocaine or you are going to receive an awful long period of time in prison in the United States.

In terms of specific deterrence, at the age of 77, it seems unlikely that Mr. Younes is going to get involved in drug trafficking.  On the other hand, he got involved in this deal when he was more than 70 years old, so I don't know.  Maybe you would.

I don't see protection of the public as a big deal.  I do see the need to provide the defendant with needed medical care, and I certainly agree that the defendant should be designated to a medical facility to keep a watch on his medical conditions.

Based on my consideration of the sentencing factors, I find that a guideline sentence is somewhat longer than necessary to achieve the goal of sentencing.  Therefore, I am varying downward from the guideline range, but not as far down as the defense urges.

Mr. Younes, I sentence you to the custody of the attorney general for a period of 10 years, and a $10,000 fine,

N6R3YOU2

to be followed by a period of supervised release of three years.

There are mandatory conditions of supervised release. The defendant must not commit another crime. The defendant shall not illegally possess a controlled substance. The defendant shall not possess a firearm or other destructive device. The defendant will not be subject to mandatory drug testing because he poses a low risk of drug abuse. The defendant must cooperate in the collection of DNA.

In addition to the standard conditions of supervision, I am imposing the following special conditions. If for some reason the defendant remains in the United States after his prison term is over, the defendant must submit his person, residence, office, vehicle, papers, computer, other electronic communications, data storage device, cloud storage or media and effects to search if the probation officer has a reasonable suspicion that contraband or evidence of a violation of conditions of release may be found there. If needed, the probation office can conduct the search with the assistance of law enforcement. Any search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. And the defendant must inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant must obey the immigration laws and

comply with the directives of the immigration authorities. Defendant must report to the nearest probation office within 72 hours of release, and he'll be supervised by the district of residence.

Is the government seeking forfeiture?

MS. LASKY:  No, your Honor.

THE COURT:  I must impose a $100 special assessment.

Are there open counts?

MS. LASKY:  Yes, the government moves to dismiss the open counts.

THE COURT:  The open counts are dismissed.

So Mr. McGuinness, you've requested that he be designated to a medical facility.  Do you have any other requests in terms of locations?

MR. McGUINNESS:  Yes, as close to the Miami area as possible to allow for visitation of his wife, daughters and grandchildren in order to promote rehabilitation.

Your Honor, I just also would ask clarification for the record that the sentence is to credit time spent in Colombia before he was transferred to the United States.

THE COURT:  I think the Bureau of Prisons automatically does that.

MR. McGUINNESS:  Yes, Judge.

THE COURT:  All right.

Mr. Younes, I am going to make two requests.  One,

N6R3YOU2

that you be designated to a medical facility; and second, that you be designated to the nearest medical facility to Miami to facilitate family visits.  All I can do is ask.  It is up to the Bureau of Prisons where they are going to put you, but I will make that request.

Mr. Younes, to the extent you have not given up the right to appeal your sentence through your plea of guilty and the agreement you entered into with the government in connection with that plea, you have a right to appeal your sentence.  If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis.  The notice of appeal must be filed within 14 days of the judgment of conviction.

Anything further from the government?

MS. LASKY:  No, thank you, your Honor.

THE COURT:  Anything further from the defense?

MR. McGUINNESS:  No, thank you, your Honor.

THE COURT:  Good luck, everybody.

(Adjourned)